PRAY & THOMAS, Appellees, v. W. PRESTON DONALD et al., Appellants.

**VENDOR AND PURCHASER:** Vendor's Lien—Priorities of Equities.

1 A party who is under contract both to *buy* and to *sell* the same land on the same day, and on said day is wholly unable to execute his contract to buy, and effects a compromise under which he receives from his intended purchaser a note for the amount of his ''profit,'' and under which his intended purchaser buys the land directly from the owner, has no interest or equity in said land as security for the payment of his note which will displace the *paramount right* of the owner of the land to look to the land as security for the purchase price; and especially so when such latter security was specifically provided for in the owner's favor.

**VENDOR AND PURCHASER:** Lien—When Denied. A vendor's lien

2 may not be asserted in behalf of an obligation unless it represents the purchase price of some *estate or interest in the land in question.* So held where the lien was denied to a note which represented a real

estate speculator's so-called ''profit'' in a land deal, but which was, in truth, executed in consideration of the *abandonment* of the contract.

*Appeal from Wayne District Court.*—HOMER A. FULLER, Judge.

APRIL 3, 1923.

ACTION in equity, to recover judgment upon a promissory note and to foreclose an alleged vendor's lien. There was a decree as prayed, and defendants appeal.—*Affirmed in part; reversed in part.*

*Carter & Bracewell* and *C. W. Steele,* for appellants.

*Poston & Murrow* and *V. R. McGinnis,* for appellees.

WEAVER, J.—The promissory note on which a recovery is sought had its origin as follows: W. H. Donald and W. Preston Donald (spoken of in the record as ''Preston'') are father and son, and Osee W. Donald is the son's wife. Prior to the business complications directly involved in this controversy, the elder Donald was, to a considerable extent, engaged in the purchase and sale of farm lands, and the son was in business on his own account, as a breeder and dealer in live stock. On March 1, 1917, W. H. Donald held the title to 359 acres of land, subject to mortgage liens aggregating $23,000. The possession of this land was then in the son Preston, as tenant of his father. About the date mentioned, W. H. Donald conveyed the land by deed to Preston, subject to the mortgage liens, the consideration for which conveyance is not shown. In March, 1919, there was a transaction between W. H. Donald, Preston, and one Young & Johnson, the owners of certain other lands aggregating 708 acres, by which Preston undertook to reconvey the 359 acres to his father, and the latter became the purchaser of the 708-acre tract, causing it to be conveyed directly to Preston. For some reason not made plain, the legal title to the 359 acres was left in Preston, who continued in possession, as the tenant of his father. Growing out of this transaction was an unpaid remainder of debt, to the amount of $3,500, from Preston to his father. On May 17, 1919, W. H. Donald entered into a written contract

with M. F. Pray (acting in the interest of the plaintiff partnership, Pray & Thomas), by which he (Donald) agreed to sell and convey to the latter the 359-acre tract, for the aggregate sum of $71,800, as follows: $2,500 in cash, on the execution of the contract; $12,300 on March 1, 1920; $15,000 by the assignment of a mortgage known in the record as the West and Carter, or Clark, mortgage; $23,000 by the assumption of existing first mortgage liens; and $19,000 deferred installment, to be secured by a second mortgage on the land. Preston was not a party to this contract, and it is the claim of the plaintiffs that they did not know that the legal title was in him. The fact in this respect is not very material, as Preston made no claim of right in the property, and was ready to convey or relinquish such title to the proper person. On July 30, 1919, Pray, still acting for Pray & Thomas, entered into another written contract with Preston, by which he agreed to sell to the latter the same 359 acres for the gross price of $89,750, as follows: $2,500 in cash; assumption of the first mortgage debts of $23,000; assumption of the second mortgage debt of $19,000; and the remainder, of $45,250, in cash on the settlement day, March 1, 1920. The subsequent actions of the parties will be better understood if we keep in mind the fact that the final settlement day provided for in the two contracts is the same, March 1, 1920. When that day arrived, neither plaintiffs nor Preston had the money with which to make the necessary cash settlements. It was apparently the thought and purpose of the plaintiffs to obtain, if possible, the final large money installment then falling due to them from Preston on the last contract, and therewith to pay and discharge their own prior contract with his father. On the other hand, W. H. Donald claimed to be ready to perform his agreement, and demanded delivery to him of the West and Carter mortgage. It is not an unfair characterization of the conduct of the parties at this meeting, which terminated in the giving of the note in suit, to say that it partakes largely of a mutual game of "bluff." At that date, as we may note from current history, the gigantic bubble of real estate speculation in Iowa, which reached its peak of development in 1919, was then at its bursting point, and naturally every party liable to sustain injury in the collapse sought the benefit of every

available shelter. If plaintiffs could first materialize upon their claim against Preston, they would be in a position to satisfy the claim of the elder Donald, and save their paper profit of $17,950 out of the deal, in which they never invested a dollar, except the initial item of $2,500, which has since been repaid in full. If the claim of W. H. Donald, which was first in order of time, were first paid, he would, upon conveyance of the land, have obtained the benefit of plaintiffs' assumption of the existing mortgages, would have acquired the ownership of the West and Carter mortgage of $15,000, and would have received a cash payment of $12,300 and a second mortgage securing $19,000. Neither party seems to have been willing, at the outset, to abandon the advantage, if any there was, of the position in which they were placed. W. H. Donald was owing the plaintiffs nothing except the duty to vest in them the title to the land, upon their performance of the conditions which they had agreed should be made precedent to such conveyance. Turning to the writing, we find the agreement to be that:

"If the party of the second part [plaintiffs] shall first make the payment and perform the covenants hereinafter mentioned on his part to be made and performed, the prompt performance of which payments and covenants being a condition precedent and time being the essence of said conditions the party of the first part [Donald] will convey," etc.

Before Donald could be charged with any default, there must be proof of performance or tender of performance of the conditions by the plaintiffs. There is some conflict of testimony as to what took place at the various meetings and interviews between the parties on that day, but there is little, if any, material dispute as to what was, in fact, done. It is conceded that Donald had brought Preston and wife to town on that occasion, to make a deed of the land to his father or to the plaintiffs, as might be required. Preston at no time made any claim of right in or to the land, and was ready to relinquish the naked legal title. Plaintiffs at no time tendered or offered to pay Donald the cash payment of $12,300, or to execute or deliver the second mortgage, to secure the final payment of $19,000, or to deliver to Donald the assigned mortgage for $15,000, but, on the contrary, refused Donald's demand for such delivery. It is the

claim of appellees' counsel, which has some support in the plaintiffs' testimony, that they refused to deliver said assignment because they had discovered that the title to the land was in Preston, and they demanded "security" before surrendering the instrument to Donald.  This explanation is not persuasive, for it is quite inconsistent with their own version of the transaction which was had on the settlement date.  The fact that the title was in Preston, who made no claim thereunder, and the matter of its transfer, do not appear to have been the subject of any serious controversy.  That plaintiffs relied upon obtaining from Preston the means with which to pay the elder Donald, or upon effecting some sort of triangular arrangement by which Preston should assume their obligation to his father, is very clear.  As a witness, Pray, answering a question as to how he proposed or expected to make the cash payment of $12,300, says:

"I reckon, if Preston had paid me, I would have paid his father fully. * * * I expected to pay it out of the money Preston was to pay me. * * * If Preston had paid me what he owed me, I would have had the money. * * * I might have said that I could not settle for the farm, and if Henry [the father] would take Preston in lieu of myself, I would take his note for my profit; that I would simply take Preston's note for my profit, and let Preston settle with his father and assume my debt. My best recollection is, I got the note.  That is all I know."

The other partner, Thomas, appears to have taken only a secondary part in the deal, the business being largely managed by Pray.  He was present, however, and had a hand in the transaction of March 1, 1920; but his story is fragmentary, and by no means clear.  He says:

"We went there to see W. H. Donald.  I don't remember enough of the conversation to tell it. There was some confusion. It seemed to me Donald was mad because the notes and mortgage were not turned over to him. * * * There was nothing said about the deeds that I remember."

Of a subsequent interview on the same day, he says:

"We went back there [into the bank] to finish up the settlement, I suppose, in a way. *It was decided that no transfer of deeds be made,* and that Preston make a note for his part of

the payment to us. There was nothing said as to how Preston was to *pay* his father. They said they would settle between themselves, but no details were spoken of. * * * The note of Preston for $17,950 was to be one part of it, I suppose. Preston was to give us a note. Pray was to keep the Clark note and mortgage, make his note for the amount he owed us, and they would settle the rest among themselves. * * * I suppose I agreed we were not to have the farm. * * * There was nothing said as to any of these things we agreed to do. I supposed we were to be relieved from doing them. * * * It was my understanding that the contract was at an end.''

For the defendants, W. H. Donald testifies, referring to March 1, 1920:

''I came from home to settle, and had Preston and his wife here to make the deed. I told Pray I was ready to settle according to contract. He said to me: 'I don't know as I have any settlement to make. Preston and me have got to settle first.' * * * I told him I had nothing to do with that settlement.''

Referring to an interview later in the day, and evidently after some tentative compromise or understanding had been reached between plaintiffs and Preston, the father continues his testimony as follows:

''Later in the day, I saw Pray, Thomas, and Preston by the bank. Pray knew I did not have the title, as I told him in the road, when he came to see me, that the deed would have to be made by Preston to me and from me to him. Pray said Preston would give his note for the profit, $16,000 to $18,000. I asked him with whom I was to settle, and Preston said he would get a loan right away. We then went into the bank, and Preston gave Pray & Thomas a note, and he also gave me a note for $52,000. * * * This amount was for the $46,300 that Pray & Thomas owed me, for $3,500 difference in the farms and interest on $16,000 other money. * * * Preston also agreed that, if he did not get the loan, he would give me a mortgage.''

That Preston, as an inducement to his father to make the alleged settlement, did, at the time, undertake and promise to secure the latter by lien or mortgage upon the land for the obligations so assumed is not only testified to by Donald himself, but it is corroborated by his sons, who claim to have been

present. Its only denial is such as is raised by the testimony of plaintiffs that they heard no such promise. They unite, however, in saying that their obligations under the contract with the father, witnessing indebtedness to the latter to the amount of more than $70,000, were to be taken over by Preston, and that Donald consented thereto upon terms or conditions to them entirely unknown. There is nothing to indicate that the father, who was himself carrying a heavy load of debt, was taking on this additional burden gratuitously, and the assertion that the son did undertake to secure him by mortgage or otherwise has the support of reasonable probability, and we think may be held to have been sustained by the record.

In their petition in this action, plaintiffs allege, in substance, that they sold the 359-acre tract of land to Preston Donald; that, on March 1, 1920, said purchaser paid to them all the agreed price of the land except the sum of $17,950, for which amount he then and there made to plaintiffs the note here sued upon. On this instrument they demand recovery of judgment against Preston Donald, and decree for the establishment and enforcement of a vendor's lien for that amount upon the land, as against both Preston Donald and W. H. Donald. Preston admits the making of the note, but denies an indebtedness thereon, and denies the right of plaintiffs to equitable relief. W. H. Donald denies all liability upon the note in suit, and by way of cross action or intervention pleads a right to and lien upon the land, by virtue of his prior ownership and his contract with the plaintiffs. He further alleges that, according to said contract, he became entitled to receive from plaintiffs the purchase price of $71,800 in the manner therein provided, which indebtedness is still unpaid; that, under a subsequent agreement, made March 1, 1920, Preston Donald undertook to assume and carry out plaintiffs' part in their contract to purchase the land, which arrangement was consented to by the intervener, upon the promise of said Preston to execute a.lien upon said land to him (W. H. Donald), securing payment of such indebtedness. The intervener therefore asks affirmative relief, establishing his said vendor's lien, with priority over any and all claims asserted by the plaintiffs. Other issues are raised by the pleadings and discussed in argu-

ment, but we regard those already mentioned as controlling upon the merits of the case, and we shall not stop to discuss them.

The trial court, having heard the evidence, found for the plaintiffs for recovery of judgment upon the note against Preston, and established and confirmed plaintiffs' claim for a vendor's lien upon the land, against both W. H. Donald and Preston.

I. It may as well be said at the outset that there is no room for serious doubt of the personal liability of Preston Donald upon the note in suit, and to that extent the judgment appealed from may readily be affirmed without discussion, and without reference to the validity or invalidity of the original contract between him and the plaintiffs.

II. The more troublesome feature of the case is upon the further question whether, assuming the validity of the note as the personal obligation of Preston, it represents a part of the purchase price of the land, for the collection of which plaintiffs may assert and enforce a vendor's lien, as against both Preston and his father. For various reasons, to which we shall refer as briefly as the circumstances will permit, we think this inquiry must be answered in the negative. Even if it could be said that, as between plaintiffs and Preston, a vendor's lien exists, a proposition which we think cannot be successfully sustained, it still remains true that, in the absence of any waiver on his part, the priority of right and advantage of position is with the elder Donald, who is not and never has been under any contractual obligation to the plaintiffs, except to give them title to the land upon certain conditions precedent, which they have never performed. In the absence of such performance or tender or waiver of performance, his right to withhold the title for his own protection, or to enforce a vendor's lien, if title had passed, to the full amount of the unpaid consideration, is too clear for argument. Save only the advance installment of the sum of $2,500, there was due him from plaintiffs, in one form or another, as provided in the contract, the entire purchase price of $71,800, no part of which has ever been paid. The result of the decree below is to entirely displace and ignore W. H. Donald's priority, and to give it to the plaintiffs, who

1. VENDOR AND PURCHASER: vendor's lien: priorities of equities.

are not only relieved from all liability for their admitted debt
of seventy-odd thousand dollars, but are given a superior lien
upon the property, to secure them for the payment of an alleged
"profit" which they say would have been theirs, had they car-
ried out their own contract of purchase, and Preston had been
able to perform *his* contract with them,—a contract which was
not only unperformed, but was, to all intents and purposes,
abandoned, in consideration of Preston's personal note. Ap-
pellees seek to avoid the otherwise inescapable equities of the
elder Donald by asserting that he waived his equities, and
thereby permitted the plaintiffs to take precedence. As we view
the evidence, this claim of waiver is without substantial sup-
port. Neither of the plaintiffs nor any other witness undertakes
to say that W. H. Donald made any express promise, statement,
or declaration that he would waive his lien for the purchase
price which plaintiffs were to pay for the land, nor would any
such waiver be implied from his consent to permit Preston to
take the plaintiffs' place in carrying out their contract of pur-
chase. To constitute a waiver, there must have been an intent
to waive or forego the right involved, or some act or agreement
by the person entitled to such lien which renders it inequi-
table for him to assert his right. Speaking of the arrangement
by which Preston was to take plaintiffs' place in the perform-
ance of the contract with Donald, Pray testifies that Donald
said he would take Preston for it, but further says:

"I did not know whether Donald was going to give it to
Preston, or whether Preston owed him, or how it was. * * *
They agreed to settle it among themselves. I do not know how
they were going to settle it. * * * How W. H. Donald was to be
protected, or when he was to be paid the $46,300, I do not know.
There was not much said about it,—nothing so far as protection
was concerned."

Responding to interrogatories, this witness further testified
as follows:

"Q. You understood Mr. Donald was to have out of the
land $46,300 you had agreed to pay him? A. He was to have
a second mortgage for $19,000. Q. Wasn't he to have the
whole that you agreed to pay out of that land due him, Mr.
Pray? A. I don't know. I suppose he was. I knew I owed

him $46,300 under the contract, and I expected that money to be paid to him. I understood Preston was to assume the burden of paying his father for the land. I knew Preston was not going to pay me. Henry said: 'I will take Preston for it.' I did not know whether Henry was going to give it to him or whether Preston owed him, or how it was. * * * I did not think it any of my business how Preston was to pay for the land. I supposed it had to be paid for by Preston or somebody else.''

The other plaintiff's testimony is to the same effect. He says:

''I knew nothing how they [Donald and Preston] were to settle. * * * I do not know whether there was any obligation from Preston to Donald or from Donald to Preston.''

Again, he says:

''There was nothing said in the bank as to who should perform the obligations under that contract. I do not know who was to make the mortgage on the land that we reserved the right to make. There was nothing said as to whether it would ever be made. * * * They said they would settle this matter between themselves, and I did not consider it any of my business how it was settled. * * * The only reason why I hoped to be relieved from doing these things is that we never got the farm. * * * I suppose one would say that the agreement we made that day was that we would be released from these obligations. *It was my understanding that the contract was at an end.* We had made no arrangements with anyone to carry out the contract we had made. I did not expect to carry it out, after we did what we did.''

Assuming it to be literally true (and this assumption is more favorable to plaintiffs than their own testimony justifies) that they sold or transferred to Preston all the rights and equities acquired by them under their contract with Donald, and that, in consideration of such sale and transfer, Preston agreed to assume their obligations to their vendor, and that the latter consented to such arrangement, it operates in no manner to release or discharge the lien of the vendor for the unpaid consideration. True, it was competent for Donald, if so minded, to have agreed to waive or release his superior rights, in consideration of plaintiffs' acceptance of Preston's note in settlement

or discharge of the latter's liability under his junior contract; but, as we have said, there is an utter absence of proof of such agreement; and in addition to the presumption that (in the absence of any agreement express or implied to the contrary) the lien of Donald remained unimpaired, so long as the debt which it secured remained unpaid, the evidence quite clearly establishes the fact that Donald's consent to the transaction was given upon the express promise of Preston to secure his father's claim by lien or mortgage upon the property. Plaintiffs do not profess to deny this fact, but deny that they knew of such an agreement, and admit that they neither inquired nor cared how Donald and Preston were to settle their rights between themselves. It must, therefore, we think, be taken for granted that, unless a waiver or release is to be predicated upon conditions arising since the giving of the note in suit, plaintiffs' claim of a lien upon the land, if any they have, for the payment of the note, is subject to Donald's lien, under their prior contract with him. In short, Donald's lien was not released or discharged or subordinated by plaintiffs' contract with Preston or by Preston's assumption of the debt to the vendor. *Foster v. Paine,* 63 Iowa 85; *Loomis v. Davenport & St. P. R. Co.,* 17 Fed. 301; 29 Am. & Eng. Encyc. of Law (2d Ed.) 746; *Anderson v. Spencer,* 51 Miss. 869, 871.

III. Nor should it be overlooked that, even if it should be thought that Donald had no technical vendor's lien, he further shows that he consented to the settlement between plaintiffs and Preston upon the assurance of the latter that he would raise the money by negotiating a loan, or, failing so to do, would secure his father by a mortgage on the land. It further appears that the loan did not materialize, and that, at a later date, Preston did execute a mortgage in Donald's favor. As between Donald and Preston, this agreement constituted an equitable mortgage, which is to be treated in equity as creating a specific lien upon the property. Pomeroy on Equity Jurisprudence (4th Ed.), Section 1235. It appears in the instant case that the mortgage was not executed until December 22, 1920, and it is pointed out that this action had been commenced a few hours earlier, and it is argued therefrom by the appellees that this has the effect to give priority to their claim. Without stopping

to consider what might have been the rights of the parties, had this action been brought to subject the property to payment of some claim not originating in or growing out of the primary transaction between the parties, it is sufficient, under the circumstances, to say that the order of priority of right, as between the lien claimants, is not changed by the fact that the one asserting an inferior equity is first to bring suit for its enforcement.

It is further contended in this connection that the mortgage taken by Donald operates as a waiver of his lien because, in addition to the unpaid purchase price named in the contract, there was included in the same security a further or other indebtedness owed by Preston. It is, of course, well established that a vendor's lien will not be recognized or enforced for a gross sum which includes the purchase price of lands so mingled or blended with other considerations as not to be readily segregated; but this rule does not obtain where the price of the land is made clearly to appear. *Lyon v. Clark,* 132 Mich. 521 (94 N. W. 4); *Boyd v. Greer,* 70 Ind. App. 77 (123 N. E. 122); 39 Cyc. 1830. In the present case, the purchase price of the land and the amount thereof unpaid are shown without dispute.

IV. In deference to the appellees' urgent contention that a vendor's lien is shown in their favor, we have thus far sought to show that, even if this be true, such lien is necessarily inferior to the lien of W. H. Donald; but, as we have elsewhere suggested, we are unable to understand on what equitable basis any lien can be asserted in support of the debt represented by the note of Preston Donald. In so far as this feature of the case is concerned, the question of the rights of the elder Donald may be left out of consideration. A vendor's lien is just what its name implies. Its effect is to give to the vendor of real estate a right to enforce collection of the sale price from the estate sold. It is not an interest or estate in the land sold, but is a mere equity, to be enforced by the court in aid of the vendor's action to recover the agreed selling price. *Spindler v. Iowa & O. S. L. R. Co.,* 173 Iowa 348, 354. It does not attach to the property generally, but to the estate or interest sold. In other words, the seller neither acquires nor retains a lien on anything more

*2. VENDOR AND PURCHASER: lien: when denied.*

than the estate with which he was himself vested, and which he has sold or transferred to his vendee. *Rogers Dev. Co. v. Southern Cal. R. E. Inv. Co.,* 159 Cal. 735 (115 Pac. 934). In the cited case it is well said that:

"The lien of a vendor is founded upon the just principle that the vendee ought not to be allowed to keep land unless he pays the price. It follows from this that it attaches only to the estate or interest for which the price was to be paid. *If the sale is of an equitable interest only, and is made to one who already has the legal title, the lien will not attach to the legal estate in fee, but only to the equitable interest or estate which was the subject of the sale.*"

That a vendor's lien is not restricted to sales of lands in fee, but will attach to sales and transfers of equities therein, may be conceded, subject, however, to the limitation just stated. In their brief, counsel for appellees state the rule to be that a vendor's lien "attaches in favor of one who holds only a contract of purchase for land the title to which is in another, *where he sells his interest in the real estate to another and causes conveyance to be made to him.*" (The italics are ours.) Tested by an application of these rules, it clearly appears that, under the conceded facts and circumstances in this case, the assertion of a lien in favor of the plaintiffs must be denied. They did not sell or convey the land to Preston Donald. They were themselves never vested with any title which they could convey. The extent of their interest was the contract right to acquire the title upon the performance of certain conditions. That right or interest they undertook to sell or·transfer to Preston, and under the rule above stated, it may be conceded that they retained a lien, not upon the fee, but upon the contract right which they had acquired from W. H. Donald. The preservation and enforcement of such lien, even as against Preston, could be waived or lost by them by rescission or abandonment of the contract made with him.

Without extending this opinion to repeat the matters of evidence already sufficiently quoted, we find it well established that, on the so-called settlement day, March 1, 1920, the plaintiffs were not ready, able, and willing to perform the conditions precedent to their acquirement of the title from W. H. Donald,

without first collecting the money upon their contract with Preston; and, the latter being unable to make such payment, a compromise or settlement was effected, by which, in consideration of receiving the promissory note of Preston for the "profit" or difference between the price of the land as fixed in the contract with W. H. Donald and the price as fixed in the contract with Preston, the deal was to be abandoned, and plaintiffs were to be released from further liability upon the original contract with W. H. Donald. Said note, the one in suit, was executed; and since that time Preston has paid to plaintiffs thereon an amount more than equal to their advance installment of $2,500. That this settlement or compromise was intended and understood as satisfying the several contract rights of the parties, is hardly open to doubt. The note was not given for the contract price of the land, but rather as a premium or price for its abandonment. Preston had the legal title already, and had it at all times during all these transactions, though the real beneficial ownership was in W. H. Donald. There was no occasion for any deed or conveyance from plaintiffs; for, as the result of the triangular adjustment, they had neither title nor interest to convey. In short, to use the language of the plaintiff Thomas, the "farm deal was off" and the "contract was at an end;" and, in the language of Pray, he "was to be relieved of the obligation to pay $43,600. I was to have that note for my profit. I relied upon being released of the $46,000, when Henry said for Preston to give his note, and they would settle among themselves." Neither of the Donalds take title or equity from or through the plaintiffs, and no lien, equitable or otherwise, secures the payment of the note sued upon. The decree below sustaining such equitable claim cannot be sustained.

V. Other issues covered by the pleadings and arguments are rendered immaterial by our conclusion already announced, and we pass them without discussion or decision.

Appellees' motion to dismiss the appeal on the ground that, by reason of certain other litigation, the appellants no longer have any beneficial interest in obtaining a reversal in the present case is denied.

The personal judgment against W. Preston Donald is affirmed. The decree establishing a vendor's lien is reversed, and

the petition asking equitable relief is dismissed.   Costs will be taxed in favor of the appellants.—*Affirmed in part; reversed in part*.

PRESTON, C. J., STEVENS and DE GRAFF, JJ., concur.